IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SAMUEL L OWENS,<br>*Plaintiff* | §<br>§<br>§ | |
| -vs- | §<br>§ | SA-18-CV-01313-XR |
| CPS ENERGY,<br>*Defendant* | §<br>§<br>§<br>§ | |

# ORDER

On this date, the Court considered Defendant CPS Energy's Motion for Summary Judgment (ECF No. 32). After careful consideration, the Court GRANTS summary judgment in favor of Defendant for the reasons stated below.

## BACKGROUND

This case arises out of the termination of Plaintiff's employment following his violation of Defendant's drug-free workplace policy. Defendant is a municipally owned gas and electric utility operating in Bexar County, Texas and seven other surrounding counties. Plaintiff was employed as a Utility Worker from July 2010 until his discharge on May 11, 2018. At the time of his discharge, Plaintiff worked in Defendant's Northwest Service District Overhead Maintenance Customer Construction Department, and his role required him to obtain a commercial driver's license ("CDL") to perform some of his duties.

Defendant's "CPS Energy Alcohol and Drug-Free Workplace Policy" (ECF No. 32-8) ("Drug-Free Policy") applies to all employees, and provides for termination in the event an employee refuses to submit to drug testing, which is defined to include "failing to provide a urine specimen," "failing to provide an adequate urine specimen … without a valid medical

1

explanation," and "failing to remain at the testing site until the testing process is complete," among others. The Drug-Free Policy requires supervisors who know an employee has engaged in conduct prohibited by the Policy to immediately remove the employee from performing job functions. The Drug-Free Policy provides for several types of testing, including random testing conducted at "any interval determined by the company" on all "Covered Positions" regulated by the U.S. Department of Transportation ("DOT"). Defendant maintains an additional "DOT – Alcohol and Drug-Free Workplace Policy," which applies to all employees in Covered Positions, and which is supplemented by the Drug-Free Policy where applicable (ECF No. 32-7) ("DOT Policy"). Some of Defendant's employees perform work on gas pipelines and so are also considered covered employees under DOT's Pipeline and Hazardous Materials Safety Administration ("PHMSA"), which has its own regulations regarding drug testing. *See generally* 49 C.F.R. § 199.100 *et seq.*

Defendant conducts random drug testing of its employees on a quarterly basis. Every quarter of the calendar year, Defendant's Program/Project Manager and Certified Designated Employer Representative, Clevette Hall ("Hall"), uses a scientifically validated computer software program[1] to generate a list of employees to be tested during that three-month period. The software generates a list of employees identified only by their employee identification number – neither Hall nor any other manager or supervisor has input into which employees are selected for random drug testing (ECF No. 32-5 ¶ 4, 13). Hall imports the software's list into a spreadsheet, adds employee names and other necessary information, and divides the list into thirds – one third to be tested each month of the quarter.[2] The day before a random drug test,

---

[1] DOT-PHMSA regulations require that the selection of employees for random drug testing be made by a scientifically valid method. *See* 49 C.F.R. § 199.105(c).

[2] Hall typically does not alter which employees fall into which month, but she will do so if an employee was tested in the immediately preceding quarter. In that case, Hall does not remove the employee from testing in that quarter

2

Hall notifies the supervisor of each selected employee, verifies the employee's availability to be tested at the scheduled time, and provides the supervisor with a notification form.[3]

On the day of the test, each supervisor informs each selected employee and gives them their notification form. The employee must then report for testing with the collection provider, ARCpoint Labs ("ARCpoint"), a third-party company engaged by Defendant. At the conclusion of a drug test, ARCpoint sends the preliminary results to a Medical Review Officer ("MRO") to be verified. If the result of the drug test is anything but "negative," the MRO makes a reasonable effort to contact the employee and give them an opportunity to discuss the result. When the MRO completes his review, he notifies ARCpoint and Hall of his determination or verification of the results. If the outcome of the test requires further action under Defendant's policies, Hall notifies the appropriate management or human resources personnel.

In the second quarter of 2018, Plaintiff's employee number was included in the random pool of employees to be tested (ECF No. 32-12). Since Plaintiff had already been tested in the first quarter of 2018,[4] Hall ensured he was placed in the May (rather than the April) group for testing, pursuant to her usual practice. On the morning of May 8, 2018, Plaintiff reported for his shift beginning at 6:30 a.m. His supervisor, Customer Construction Manager David Miller ("D. Miller") informed Plaintiff he had been selected for testing that day, which Plaintiff did not think was anything out of the ordinary at the time (ECF No. 32-3, Pl. Dep. 122:18–20). Plaintiff

---

altogether, but instead ensures that the employee is tested in the second or third (as opposed to the first) month of the quarter.

[3] The Drug/Alcohol Test Notification Form advises employees of their random selection, informs them that they have 15 minutes to report to the collection provider after receiving the notification, and states that "Refusals, not reporting in a timely manner, not making a first attempt, and/or failure to test are policy violations which will lead to corrective action, up to and including termination." The form is acknowledged by the signature of both the supervisor/manager delivering it and by the selected employee. *See* ECF No. 32-13.

[4] During his employment, Plaintiff was subject to random drug testing on four occasions: December 3, 2012; April 3, 2017; January 10, 2018; and May 8, 2018. He also submitted to a pre-employment drug test on June 23, 2010. For each of these tests except the May 8, 2018 test, Plaintiff's results were negative for the presence of any prohibited drugs.

received and signed his notification form (ECF No. 32-13) and reported for testing with ARCpoint.

Plaintiff made his first attempt to provide a urine specimen at 6:33 a.m. but was unsuccessful. Plaintiff made a second unsuccessful attempt about two hours later. ARCpoint personnel explained to Plaintiff the DOT's "shy bladder" regulations, and that if he failed to provide a sample within three hours it could be considered a refusal to test (ECF No. 32-3, Pl. Dep. 136:2–5). Plaintiff did not make any additional attempts before the three-hour mark, despite being given the opportunity to do so (ECF No. 32-3, Pl. Dep. 164:14–21). Plaintiff left the ARCpoint testing site and returned to his jobsite briefly. Meanwhile, ARCpoint personnel informed Hall that Plaintiff "did not want to make a final attempt to provide a urine sample" before the three-hour period had expired (ECF No. 32-20). Hall advised D. Miller of Plaintiff's refusal to test, and D. Miller then instructed Plaintiff to leave the jobsite and return to the Northwest Service District offices. Once there, Plaintiff met with D. Miller, Manager Gilbert Brown, and Director Richard Lujan, with Hall joining by phone. Hall explained the applicable regulations, that an MRO would be contacting Plaintiff to discuss the results,[5] and that the potential outcome was a refusal to test (ECF No. 32-3, Pl. Dep. 146:13–25). Plaintiff was sent home and suspended with pay awaiting the final results of his drug test.

After Plaintiff was sent home, he called the MRO, Dr. Paschall of National Medical Review, who conducted a "Donor Interview" with Plaintiff. Dr. Paschall asked Plaintiff if he had any preexisting conditions or other medical reason he could not produce a urine specimen during his three-hour testing window. Plaintiff admitted (and continues to admit) that he has no

---

[5] The parties agree that during this meeting Hall also gave Plaintiff contact information for an MRO. According to Plaintiff, the information Hall provided was for the wrong doctor – Dr. Tetrick, who had retired. Plaintiff tracked down the correct contact information for the actual MRO (Dr. Paschall) himself. Plaintiff does not contend that Hall gave him the incorrect contact information on purpose. Pl. Dep. 148:5-16. Both doctors are associated with National Medical Review, the company Defendant uses for MRO reviews of drug tests.

4

such medical condition (ECF No. 32-21; ECF No. 32-3, Pl. Dep. 151:7–20). According to Plaintiff, Dr. Paschall suggested that Plaintiff call Defendant and ask for a retest (ECF No. 32-3, Pl. Dep. 151:21–152:2). Plaintiff called Lujan, who told Plaintiff to call HR; and so, Plaintiff called Hall and told her about his conversation with Dr. Paschall (*Id.* at 149:22–150:14). Hall was at lunch and asked if she could call Plaintiff back (*Id.* at 150:7–14). Before calling Plaintiff back, Hall called Dr. Paschall to confirm what Plaintiff had told her (ECF No. 32-15). According to Hall, Dr. Paschall denied instructing Plaintiff to call Defendant to schedule a retest. Hall called Plaintiff back and disputed that Dr. Paschall had told Plaintiff to request a retest (ECF No. 32-3, Pl. Dep. 150:22–151:4).

In an attempt to conduct his own retest independently, Plaintiff then went to Texas MedClinic and requested a DOT drug test. When Plaintiff stated he wanted the results to be sent to Defendant, the clinic called Defendant to request authorization (*Id.* at 154:21–155:4). Lisa Jarzombek Balcar ("Balcar"), an employee in Defendant's Employee Benefits department, answered the clinic's call and then asked Hall if she had sent Plaintiff to the clinic for a random drug test. Hall told Balcar that she had not, and instructed Balcar not to approve the request (ECF No. 32-15). Balcar informed the clinic, who told Plaintiff and then asked him to leave, which he did (ECF No. 32-3, Pl. Dep. 155:23–156:11).

Later that day, Dr. Paschall sent his final determination/verification of Plaintiff's results as "REFUSAL TO TEST" to ARCpoint (ECF No. 32-21), who sent it to Hall, who notified HR. In accordance with Defendant's policy requiring termination for a refusal to test, HR began the discharge process. Plaintiff's termination was approved by six decisionmakers.[6] On May 11,

---

[6] Defendant's discharge process requires input and approval from a group of collective decisionmakers. Plaintiff's termination was approved by J. Miller and Lujan as well as Vice President of People and Culture Lisa Lewis, Chief Safety and Security Officer Fred Bonewell, Senior Director of Labor Engagement Marian Briggs, and Senior Manager of Human Resources Veronica Uriegas. ECF No. 32-32.

Lujan called Plaintiff to inform him that his employment was being terminated. Plaintiff was also issued a letter dated May 11, 2018, which states that the decision to terminate Plaintiff was "based on your failure to provide urine sample for testing without a valid medical explanation after receiving notice for testing under the CPS Energy DOT Alcohol-Drug-Free Workplace Policy." (ECF No. 32-24).

On June 18, 2018, Plaintiff dual-filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission and the Texas Workforce Commission Civil Rights Division, alleging Defendant discriminated against him based on race (ECF No. 32-25). The Charge described Plaintiff's May 8 drug test, failure to provide a specimen, and subsequent termination. Other than his post-termination Charge, Plaintiff never made any complaint of discrimination to Defendant during his employment.[7] Plaintiff admits that the only complaint he ever made during his employment concerned a confrontation he had with a co-worker in February 2018, which Plaintiff did not allege was related to his race or color.

After the EEOC dismissed Plaintiff's Charge and issued a Notice of Right to Sue, Plaintiff filed the present lawsuit in the District Court for Bexar County, Texas, alleging that Defendant discriminated against him on the basis of his race and color in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. After removing the case to this Court, Defendant filed the present Motion for Summary Judgment (ECF No. 32), seeking dismissal of Plaintiff's lawsuit in its entirety.[8] Plaintiff has failed to respond.

---

[7] Defendant maintains an "Equal Employment Opportunity and Anti-Harassment Policy" (ECF No. 32-1) applicable to all employees, vendors, contractors and customers. The EEO Policy: prohibits discrimination, harassment, and retaliation based on protected characteristics such as race and color; explicitly prohibits supervisors or managers from basing employment decisions on any protected characteristic; outlines procedures to report prohibited conduct; and requires supervisors or managers to promptly report any observations, information, or reports of discrimination or harassment.

[8] Defendant's Motion for Summary Judgment focuses on Plaintiff's Title VII claim and neglects to include any discussion about Section 1981. Defendant's motion also does not separately address any potential claims of hostile

# DISCUSSION

## I. Summary Judgment Standard

The Court will grant summary judgment if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). Thus, a genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). "To satisfy its initial responsibility, a movant without the burden of proof at trial need only point out that there is an absence of evidence to support the non-movant's claim to shift the burden to the non-movant to show that summary judgment is not proper." *Bishop v. Seterus, Inc.*, No. SA-18-CV-843-XR, 2019 WL 2774339, at *1 (W.D. Tex. July 1, 2019) (citing *Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991)).

Once the burden shifts, the nonmoving party must "go beyond the pleadings" and designate competent summary judgment evidence "showing that there is a genuine issue for trial." *Adams*, 465 F.3d at 164; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). "Rule 56 does not impose upon the district court a duty to sift through the

---

work environment or retaliation. Nevertheless, the same analysis in Defendant's motion applies to all of Plaintiff's claims, and Defendant's motion seeks dismissal of Plaintiff's "lawsuit in its entirety."

record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Although courts in the Fifth Circuit "construe[] the submissions of *pro se* litigants broadly in deference of their status," this liberal construction does not alleviate the *pro se* party's burden to present evidence in support of their claims. *Garza v. Laredo Indep. Sch. Dist.*, 309 F. App'x 806, 809 (5th Cir. 2009) (affirming district court's grant of summary judgment against *pro se* plaintiff claiming national origin discrimination and retaliation). If the nonmoving party does not respond to a motion for summary judgment, summary judgment may be entered against them if appropriate. *Fields*, 922 F.2d at 1187 (5th Cir. 1991). However, even where the nonmoving party has failed to respond, "[a] motion for summary judgment cannot be granted simply because there is no opposition." *Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985). The moving party must still meet its burden or else "the court may not grant the motion, regardless of whether any response was filed." *Id.* at 1279.

The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). Mere conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, and hearsay evidence (unless within a recognized exception) are not competent summary judgment evidence. *Walker v. SBC Servs., Inc.*, 375 F.Supp.2d 524, 535 (N.D. Tex. 2005) (citing *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)). When ruling on a motion for summary judgment, the Court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540

(5th Cir. 2005). A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55. However, when the nonmoving party has failed "to address or respond to a fact raised by the moving party and supported by evidence, then the court may consider the fact as undisputed" and "[s]uch undisputed facts may form the basis for a summary judgment." *Broadcast Music, Inc. v. Bentley*, Civil Action No. SA-16-CV-394-XR, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017). "The court also considers 'evidence supporting the moving party that is uncontradicted and unimpeached.'" *Gordon v. Acosta Sales & Mktg., Inc.*, No. SA-13-CV-662-XR, 2014 WL 7339117, at *3 (W.D. Tex. Dec. 22, 2014), *aff'd*, 622 F. App'x 426 (5th Cir. 2015) (quoting *Reeves*, 530 U.S. at 151).

## II. Legal Framework

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of race or color. 42 U.S.C. § 2000e–2(a)(1). Where a plaintiff lacks direct evidence of discrimination, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* governs. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order to survive summary judgment under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he is qualified for the position at issue, (3) he suffered an adverse employment action, and (4) he was replaced by someone outside the protected class or was treated less favorably than others similarly-situated. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. 792 and *Reeves*, 530 U.S. 133). If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to proffer a

legitimate, nondiscriminatory reason for its action. *Okoye*, 245 F.3d at 512. If the defendant satisfies its burden of production, the plaintiff may still prevail by offering sufficient evidence to create a genuine issue of material fact that either (1) the defendant's reason is false and is a pretext for discrimination, or (2) that although the defendant's reason is true the plaintiff's protected characteristic was a "motivating factor" in its decision. *McDonnell Douglas*, 411 U.S. at 804–05; *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 394 (5th Cir. 2008).

When used as parallel causes of action, Section 1981 requires the same proof as Title VII to establish liability for employment discrimination, *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999)), and the same burden-shifting framework established in *McDonnell Douglas* applies. *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989)). Therefore, the Court will analyze Plaintiff's claims under both statutes together.

### III. Race and Color Discrimination

#### a. Plaintiff fails to establish a *prima facie* case of discrimination

It is uncontested that Plaintiff is an African American who was qualified for his position and suffered an adverse action when his employment was terminated. But Defendant correctly points out that there is an absence of evidence to support that Plaintiff was either replaced by someone outside the protected class or was treated less favorably than others similarly situated.

Plaintiff offers no evidence regarding his replacement and admits that he does not know who replaced him (ECF No. 32-3, Pl. Dep. 163:6–8). Plaintiff's conclusory allegations that he was selected for a random drug test "because he was being pushed out of his position" for "another person with a different Race and Color" (ECF No. 1-4 at 3) are mere "conclusory

allegations, speculation, or unsubstantiated assertions" that are "inadequate to satisfy the nonmovant's burden." *Chen v. Ochsner Clinic Found.*, 630 F. App'x 218, 223 (5th Cir. 2015).

Plaintiff also fails to establish that he was treated less favorably than other similarly situated employees. Plaintiff's allegations that he was chosen for his random drug test because of his race or color (ECF No. 1-4 at 3) or that he would have been given an opportunity to retest if he were a "Caucasian male" (ECF No. 12 at 2), lack any supporting record evidence and are mere suspicions that do not create a genuine fact issue for trial. *Chen*, 630 F. App'x at 223. This is especially true in the face of Defendant's unrefuted summary judgment evidence that Plaintiff was in fact randomly selected for his drug test without regard to his race or color, and that no other employee has been allowed to conduct a retest in the last five years (ECF No. 32-5 ¶ 15).

Plaintiff attempts to compare himself to other employees who violated other workplace policies – falsifying timesheets, carrying a firearm in a company vehicle, and being charged with DUIs outside of work. These claims, supported by nothing but hearsay evidence, also fail as a matter of law because the other employees had different job positions and/or supervisors and committed different policy violations, and thus are not similarly situated under the law of the Fifth Circuit. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."); *see also Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 213 (5th Cir. 2018), *as revised* (Aug. 10, 2018) (employees who performed different job functions were not similarly situated); *Vincent v. College of the Mainland*, 703 F. App'x 233, 238–39 (5th Cir. 2017) (proffered comparator not similarly situated where plaintiff failed to establish that he violated the same policy as plaintiff); *Crosby v. Computer Sci. Corp.*, 470 F. App'x 307, 309 (5th Cir. 2012)

(proffered comparator not similarly situated where he violated different aspects of policy than plaintiff).

> b. <u>Defendant has produced a legitimate, non-discriminatory reason that Plaintiff has failed to refute.</u>

Even if Plaintiff had established a *prima facie* case of discrimination, his claims would still fail as a matter of law because Defendant has produced unrefuted evidence to show it had a legitimate, non-discriminatory reason for its adverse action against Plaintiff. The record shows that Defendant selected Plaintiff for random drug testing without regard to race or color, and that his termination for refusal to test was in accordance with Defendant's neutral, written policies and not motivated by race. Plaintiff has presented no record evidence that any of the decisionmakers involved in his random drug testing or his termination had any sort of racial animus towards him. He even admits that other than "other employees who had violated CPS policy … who were not fired," he has no reason to believe that his termination had anything to do with his race (ECF No. 32-3, Pl. Dep. 170:4–20). Once again, Plaintiff's conclusory allegations and suspicions that his termination was motivated by race are insufficient to show pretext or to defeat summary judgment. *See Eyob*, 745 F. App'x at 214 (affirming summary judgment and holding defendant's treatment of employees not similarly situated to plaintiff cannot support an inference of pretext).

**IV. Other Potential Claims**

Plaintiff does not clearly plead a cause of action for hostile work environment or retaliation, and he did not clearly allege either in his EEOC Charge. But in accordance with the liberal construction afforded *pro se* litigants, the Court will examine these potential claims on the merits.

### a. Hostile Work Environment

To establish a *prima facie* case of hostile work environment based on race discrimination under Title VII, Plaintiff must establish (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment affected a term, condition, or privilege of employment and (5) the defendant knew or should have known of the harassment and failed to take prompt remedial action. *Carrera v. Commercial Coating Servs. Int'l, Ltd.*, 422 F. App'x 334, 337 (5th Cir. 2001). Plaintiff clearly fails to establish any such *prima facie* case.

Plaintiff alleges that he "discovered" his work environment "became very hostile" during his May 2018 random drug test (ECF No. 1-4 at 4). Plaintiff also states that he "feels that Employers should be encouraged to take appropriate steps to prevent and correct unlawful harassment," and goes on to recite several statements of law regarding harassment and hostile work environment claims (*Id.* at 7–9). But Plaintiff fails to allege any specific conduct that he believes was abusive or harassing because of his race, much less anything that could rise to the level of "discriminatory conduct … so severe or pervasive that it created a work environment abusive to employees because of their race." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). Summary judgment is appropriate where a plaintiff "conclusorily alleges that Defendant created a hostile work environment" but "never specifically points to the specific conduct giving rise to these allegations" and "[t]he record contains no evidence of any incident wherein Plaintiff was subjected to harassment because of his race … *i.e.*, no verbal comments, threats, or disparaging remarks are alleged." *See Hernandez v. Dep't of Treasury*, No. CIV.A. 02-3164, 2003 WL 22715648, at *6 (E.D. La. Nov. 13, 2003) (granting summary judgment). This Court

finds that any potential hostile work environment claim Plaintiff has raised fails as a matter of law.

### b. Retaliation

To make out a *prima facie* case for retaliation under either Title VII or Section 1981, Plaintiff must show that (1) he engaged in conduct protected by Title VII, (2) he suffered a materially adverse action, and (3) a causal connection exists between the protected activity and the adverse action. *Carrera v. Commercial Coating Servs. Int'l, Ltd.*, 422 F. App'x 334, 339 (5th Cir. 2011). "The type of conduct protected by Title VII is broadly defined as opposition to any practice made unlawful by Title VII." *Niemietz v. City of Converse*, No. SA-17-CV-401-XR, 2017 WL 6265089, at *4 (W.D. Tex. Dec. 7, 2017) (citing *Crawford v. Metro Gov't of Nashville and Davidson Cty., Tenn.*, 555 U.S. 271, 277–78 (2009)). Plaintiff fails to raise a genuine issue of material fact as to both engaging in protected conduct and causation.

Plaintiff alleges that his February 2018 complaint against his co-worker "for invading his personal space, yelling and pointing his finger in Plaintiff's face" was the reason he was selected for his May 2018 random drug test. He also claims that Defendant wanted to terminate his employment after this complaint "because they thought that he was going to be problematic for them," and that he was not allowed a retest "on purpose because he wrote a grievance against another CPS employee." (ECF No. 1-4 at 1–3, 7). Defendant has produced unrefuted summary judgment evidence that these allegations are not true. But even if they were, Plaintiff still fails to allege that he engaged in any protected activity – a confrontation with a co-worker that has nothing to do with a protected characteristic is not contemplated by Title VII or Section 1981. Plaintiff further admits that he made no reports or complaints of discrimination while employed with Defendant. And, Plaintiff has failed to allege, much less provide competent summary

judgment evidence, that his report of the confrontation caused any materially adverse action. Defendant has produced unrefuted summary judgment evidence that Plaintiff was drug tested based on random selection and terminated based on his violation of Defendant's Drug-Free Policy.

## CONCLUSION

The Court finds that Plaintiff has failed to raise any genuine issues of material fact so as to defeat Defendant's Motion for Summary Judgment. Plaintiff cannot establish a *prima facie* case of discrimination because he cannot show that he was replaced by someone outside of his protected class or that he was treated less favorably than other similarly situated employees. And even if he could, Defendant has produced a legitimate, non-discriminatory reason for its actions that Plaintiff has failed to respond to. Any of Plaintiff's allegations that could be construed as claims for hostile work environment harassment or retaliation also fail as a matter of law. Accordingly, the Court GRANTS summary judgment to Defendant as to all claims. The Clerk is directed to enter a judgment on behalf of Defendant. Defendant is awarded costs and may file a bill of costs pursuant to the local rules.

It is so ORDERED.

SIGNED this 24th day of October, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE